UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JEFF BEMER,

               Plaintiff,

      v.

CORRECTIONAL MEDICAL SERVICES
INC., PRISON HEALTH SERVICES, INC.,
HARRIS, LUGWIG, ANDERSON,
K. NIMR IKRAM, M. WOLCOTT,
DEBORAH CARY, AUDBERTO C.
ANTONINI, KRISHN MOHAN,
MAUREEN N. ONUIGBO, JOHN R.
KEARNEY, ASIKALA VEMULAPALLI
and OTHER UNKNOWN INDIVIDUALS,
in their individual and official capacities,

               Defendants.

_____/

CIVIL ACTION NO. 10-12228

DISTRICT JUDGE STEPHEN J. MURPHY III

MAGISTRATE JUDGE MARK A. RANDON


**REPORT AND RECOMMENDATION ON DEFENDANTS' PENDING
DISPOSITIVE MOTIONS (DKT. NOS. 75, 76, 79, 86, 97 AND 109)**

**I. INTRODUCTION**

This is a prisoner civil rights action brought under 42 U.S.C. § 1983.   Plaintiff Jeff

Bemer filed suit against several prison medical personnel and corrections officers alleging they

were deliberately indifferent to his foot injury in violation of the Eighth Amendment to the

United States Constitution (Dkt. No. 1).[1]

_____

[1] Plaintiff was paroled prior to filing this lawsuit.

-1-

Six motions are pending: (1) Sasikala Vemulapalli, M.D.'s ("Dr. Vemuapalli") motion for summary judgment and/or motion to dismiss (Dkt. No. 75); (2) Audberto Antonini M.D.'s ("Dr. Antonini") motion to dismiss and/or for summary judgment (Dkt. No. 76); (3) John Kearney, P.A.'s ("P.A. Kearney") motion to dismiss and/or for summary judgment (Dkt. No. 79); (4) Krishn Mohan, M.D. ("Dr. Mohan"), Maureen Onuigbo, M.D. ("Dr. Onuigbo") and Correctional Medical Services, Inc.'s ("CMS") motion to dismiss and/or for summary judgment (Dkt. No. 86); (5) Prison Health Services, Inc. ("PHS") and P.A. Kearney's motion for summary judgment (Dkt. No. 97); and Robert Anderson ("Anderson"), Deborah Cary ("Nurse Cary") and Jerry Ludwig's ("Ludwig") partial motion to dismiss and/or for summary judgment (Dkt. No. 109). Judge Stephen Murphy referred the motions to this Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

The parties have fully briefed the issues presented (Dkt. Nos. 92, 93, 95, 100, 101, 103, 104, 108, 109, 110, 116 and 117) and the motions are ready for disposition. Because this Magistrate Judge finds that the moving Defendants' treatment of Plaintiff's injury was not deliberately indifferent or grossly negligent as a matter of law, **IT IS RECOMMENDED** that all six motions be **GRANTED.**

## I. FACTS

**A. Plaintiff's Foot Injury and the Chronology of his Medical Treatment**

### *1. The injury*

On or about June 7, 2007, Plaintiff, an inmate at the Southern Michigan Correctional Facility ("JMF"), injured his right foot playing baseball (Dkt. No. 1, ¶ 22). Plaintiff hit a pitch

and was rounding first base when he felt a sharp pain in his right foot (Dkt. No. 92, Ex. A (Pl. Dep. 45:24-46:3)).

The severity of Plaintiff's injury was not immediately apparent.  He sat out the rest of the game but did not seek medical attention (Pl. Dep. 46:14-25).  After the game, Plaintiff claims that he told the officer in charge of his cell block that he had a "problem" with his foot and asked to "go to Medical" (Pl. Dep. 47:12-16).  The officer directed Plaintiff to report for his kitchen duty as scheduled and tell the kitchen staff about his injury (Pl. Dep. 47:18-20).

Plaintiff claims he reported to the kitchen for his afternoon shift and spoke to Harris, the Kitchen Supervisor.[2]  Plaintiff removed his sock and shoe to show Harris the "swelling and color" of his foot (Pl. Dep. 110:14-18), but claims Harris told him that there was nothing wrong with his foot and to "get back to work" (Pl. Dep. 110:16-20).

### 2. Plaintiff's interaction with Defendants Ludwig and Anderson

Plaintiff next claims to have had a three minute conversation with Ludwig in the kitchen locker room (Pl. Dep 114:4-6).[3]  Plaintiff told Ludwig that he was in "a lot of pain" and asked if he could go to Medical (Pl. Dep. 114:16-18).  According to Plaintiff, Ludwig reminded him that Harris did not believe his foot was injured, and Ludwig told him that if he walked off the job site, he would be disobeying Harris' direct order and be subject to misconduct charges (Pl. Dep. 114:18:22).

---

[2] Harris is a named defendant, but she has not been served.  A recommendation as to Harris follows in § III(C) (below).

[3] Plaintiff claims that Defendants Ludwig and Anderson were "present" during his conversation with Harris; however, he does not say that either man observed his naked foot. Indeed, it is unlikely either Ludwig or Anderson saw Plaintiff's injury, because Plaintiff later explains to Ludwig that he had shown Harris his foot (Pl. Dep. 114:16).

Plaintiff claims he also had a conversation with Corrections Officer Anderson while "limping to dish machine" to start work (Pl. Dep. 117:9).  Anderson allegedly told Plaintiff "I don't care how you have to do it, your catching [putting away trays, dishes, silverware that have been cleaned] today" (Pl. Dep.119:4-12).

Ludwig and Anderson deny being present in the kitchen to have a conversation with Plaintiff regarding his injury.  Ludwig attached his time sheet indicating he did not work on June 7, 2007 (Dkt. No. 109, Ex. 7), and Anderson claims he did not work in the kitchen on June 7, 2007 or on any other day during the entire month of June 2007 (Dkt. No. 109, Ex.2 (Anderson Dep. 10:13-23; 11:13-15)).

### 3.  *Nurse Cary*

Plaintiff "believes" he filed a medical kite[4] on June 7, 2007 but does not have the original request – which he admits would have been returned to him by Healthcare (Pl. Dep. 123:14-16; 125:12-16).  Nurse Cary claims Plaintiff wrote a kite on June 9, 2007; it was received on June 10, 2007 and she saw Plaintiff the same day (Dkt. No. 109, Ex. 9 (Cary Dep. 29:10-14)).

Plaintiff acknowledges that he was seen by Nurse Cary, on June 10, 2007 (Dkt. No. 1, ¶ 29).  He alleges that Cary applied ice to his injury "for 30 minutes; elevated the injured area; provided an ace wrap; recommended no weight bearing; and recommended two tablets of 200 mg ibuprofen for three days" (Dkt. No. 1, ¶ 31).  Nurse Cary's progress notes also indicates that she: ordered a wheelchair for Plaintiff's use from June 10  to June 12, 2007, took him off work for two days and made a referral to the Medical Service Provider ("MSP") (Dkt. No.109, Ex. 9).

---

[4] A kite is a written request by an inmate.

The next day, June 11, 2007, Nurse Practitioner ("N.P.") Wolcott saw Plaintiff.[5]  N.P.

Wolcott conducted a physical examination and ordered an x-ray of Plaintiff's right foot and ankle.

A radiology report was prepared by Michael Henderson, D.O., indicating Plaintiff had suffered a

"non-displaced fracture of the fifth metatarsal bone"[6] (Dkt. No. 45, Ex. 2).  The x-ray also showed

"old trauma of both malleoli with arthritic changes of the ankle articulating surface" (*Id.*).  After

reviewing the report, N.P. Wolcott immobilized Plaintiff's injury using an OCL® splint[7] and

entered the following orders for the management of his condition: (1) Motrin, (2) crutches; (3)

"lay in" status until evaluated by orthopedics; and (4) an ice pack to be placed on the injury for

20-30 minutes every 1-2 waking hours (*Id.*).  N.P. Wolcott also noted that a follow-up should take

place by the MSP for an orthopedics referral and that Plaintiff should report "any increase in pain,

numbness, tingliness (sp) or other concerns to MSP" (*Id.*)

### 4. Dr. Mohan

On or about June 18, 2007, Dr. Mohan reviewed the x-ray of Plaintiff's right foot, which

showed the fracture of the fifth metatarsal (Dkt. No. 103, Ex. B (Mohan Dep. 27-28)).  Dr. Mohan

also reviewed Plaintiff's medical record and determined that Plaintiff had already received

---

[5] The Court accepted the recommendation of this Magistrate Judge and dismissed
Plaintiff's deliberate indifference claims against N.P. Wolcott and Dr. Ikram on May 6, 2011
(Dkt. No. 74).

[6] In a non-displaced fracture, the fractured bone segments have not moved out of
alignment. *See* www.mdguidelines.com/fracture-ankle.  The fifth metatarsal is the bone that runs
between the tarsus (mid-foot) and the base of the small phalange (toe) on the outside of the foot.
*See* Dorland's Illustrated Medical Dictionary (31st Ed.) 2007, p. 1162.

[7] OCL is a brand of Plaster Splint Roll.

appropriate treatment for a fifth metatarsal fracture on June 11, 2007 (Dkt. No. 86, Ex. B, ¶ 6). He referred Plaintiff for an orthopedic evaluation.

Dr. Mohan next saw Plaintiff on June 25, 2007.  During this visit, Dr. Mohan did not visually examine Plaintiff's foot or perform any range of motion tests, because he continued to believe the injury was appropriately treated and Plaintiff had no complaints of pain (Mohan Dep. 41-42).  Dr. Mohan did follow-up to make sure that Plaintiff's orthopedic consultation would be scheduled and gave Plaintiff a two month accommodation for the following: a bottom bunk, a "no work" assignment, crutches, ace wraps, permission to eat at the handicap table, and use of the elevator.  Dr. Mohan also prescribed Lodine,[8] Asprin and Zantac and ordered Plaintiff to return for a follow-up visit in two weeks (Dkt. No. 86, Ex. B, ¶ 6).

In the interim, Plaintiff had his orthopedic consultation with Dr. Ikram[9] on July 5, 2007. Dr. Ikram conducted a physical examination of Plaintiff and made the following observations: pain to palpation of the fifth metatarsal; some bony prominence along the medial malleolus; a decreased range of motion of the ankle; and that he (Plaintiff) is intact to the right lower extremity (Dkt. No. 17, Ex. 2).  Dr. Ikram also reviewed x-rays which showed a healing fifth metatarsal fracture along with some degenerative changes to the ankle (*Id.*).  During the July 5, 2007 visit, Dr. Ikram provided Plaintiff with a "fracture boot"[10] and cleared him to return to work (Dkt. No.

---

[8] Lodine is an anti-inflammatory used for pain relief. *Dorland's Illustrated Medical Dictionary* (31st ed. 2007) 1080, 660.

[9] *See* note 5.

[10] A fracture or walking boot is used to protect the fracture site but also allows weight bearing on the foot as well as walking.  Certain fractures of the fifth metatarsal can be treated with a walking boot. *See* Jonathan Cluett, M.D., *Avulsion Fracture of the Fifth Metatarsal*, (updated Dec. 12, 2006) http://orthopedics.about.com/cs/lowerfx/g/ fifthmetatarsal.htm.

1, ¶¶ 46, 47).  Plaintiff was to follow-up with Dr. Ikram in four weeks (Dkt. No. 17, Ex. 2).  On

July 10, 2007, Dr. Mohan completed a consultation request form for Plaintiff

have his follow-up appointment with Dr. Ikram (Dkt. No. 86, Ex. A (Med. Rec. 468)).

       Dr. Mohan last saw Plaintiff on July 16, 2007.  He noted Plaintiff had been evaluated by

Dr. Ikram, had been given a fracture boot, and was scheduled for a follow-up visit (Med. Rec.

462).  He also noted that Dr. Ikram cleared Plaintiff for light duty work (*Id.*).  Dr. Mohan

indicated that Plaintiff had no complaints; he did not conduct an examination of Plaintiff's foot

(*Id.*).

       Dr. Ikram saw Plaintiff during a follow-up visit on August 2, 2007 (Dkt. No. 17, Ex. 3).

Plaintiff reported that he was doing well and the pain was getting better (*Id.*).  According to

Plaintiff, another x-ray, taken at the request of Dr. Ikram, showed that Plaintiff's fifth metatarsal

fracture was "incompletely healed" (Dkt. No. 1, ¶ 50).  The medical record, however, reflects that

Dr. Ikram viewed the x-ray as showing the fracture was "healing/healed" (Dkt. No. 17, Ex. 3).

Dr. Ikram advised Plaintiff that he could still use the fracture boot as needed over the next three

months (*Id.*).

       **5.  *Dr. Onuigbo***

       Dr. Onuigbo never physically examined Plaintiff (Dkt. No. 103, Ex. C (Onuigbo Dep.

21:4-6)).  On August 16, 2007, Dr. Onuidbo reviewed Dr. Ikram's notes (Onuigbo Dep. 26:2-4),

renewed Plaintiff's accommodation for a ground floor cell and ordered ACE bandages (Onuigbo

Dep. 22-24). She also ordered a follow-up visit with the MSP for approximately September 14,

2007.  However, on September 14, 2007, Plaintiff was transferred from JMF to the Pine River

Correctional Facility ("SPR") (Dkt. No. 86, p. 7).

-7-

### 6. *P.A. Kearney*

Following his transfer to SPR, P.A. Kearney saw Plaintiff on September 18, 2007.

(Kearney Dep. 39).  P.A. Kearney reviewed Plaintiff's file, ordered another x-ray of his right foot,

and scheduled a follow-up appointment on October 2, 2007 (Med. Rec. 430).  According to P.A.

Kearney, Plaintiff made no complaints, so he did not conduct a physical examination of Plaintiff's

foot (Kearney Dep. 38-39).

P.A. Kearney next treated Plaintiff on October 2, 2007.  He noted that the most recent

x-ray report was not yet available, but noted no swelling, instability or tenderness to Plaintiff's

fifth metatarsal (Med. Rec. 420).  He also noted that Plaintiff was able to bear weight and walk

without pain.  Based on his assessment of Plaintiff and review of Plaintiff's x-ray, P.A. Kearney

diagnosed a healing fifth metatarsal (*Id.*).  He ordered Plaintiff a bottom bunk assignment and

scheduled follow-up to review the x-ray (*Id.*).

P.A. Kearney saw Plaintiff to discuss his recent x-ray results on November 6, 2007 (Med.

Rec. 410).  The x-ray showed an incompletely healed fracture of the fifth metatarsal and arthritic

changes of the ankle (Med. Rec. 68).  P.A. Kearney continued his diagnosis of a healing fracture

and cautioned Plaintiff against participating in sports, aerobic activity, running or jogging (Med.

Rec. 410).

On December 3, 2007, P.A. Kearney ordered medication for Plaintiff, including Lodine for

pain and inflammation. (Med. Rec. 404).  Plaintiff had another foot x-ray on January 7, 2008

which indicated: no acute process, a nonunion fracture of the fifth metatarsal, mild degenerative

changes and bunion of the 1st digit, and calcification of the joint compartments (Med. Rec. 65).

P.A. Kearney next evaluated Plaintiff on February 13, 2008 to review his latest x-ray (Med. Rec. 388). Plaintiff claims P.A. Kearney never touched his foot during this visit. However, P.A. Kearney noted that Plaintiff's foot had no swelling and was not tender; he observed that Plaintiff walked with a normal gait, without a limp and with normal weight bearing. P.A. Kearney also noted Plaintiff's complaint of an achy right foot, which was aggravated when Plaintiff walked more than a mile (Med. Rec. 388). P.A. Kearney believed that the x-rays showed slow healing but indicated he would send Plaintiff back to Dr. Ikram in a year (February 2009) if there was still a "suggestion" of nonunion of the fracture (Med. Rec. 389). During this visit, P.A. Kearney also removed Plaintiff's light duty work restriction. (Ex. A, p. 390, 385).

Plaintiff would see P.A. Kearney several times over the ensuing months. During these visits Plaintiff complained of aching and stiffness in his right ankle and foot (Med. Rec. 335, 323). In response, P.A. Kearney continued Plaintiff's medications, recommended a depo-medrol injection[11] and ordered additional x-rays (Med. Rec. 336). He also repeatedly instructed Plaintiff to avoid sports, running and jogging (Med. Rec. 336). After reviewing Plaintiff's x-rays of October 31, 2008 which continued to show a non union fracture of the fifth metatarsal, P.A. Kearney requested a high top shoe or boot for Plaintiff and completed a Consultation Request for Plaintiff to be evaluated by Dr. Haverbush, an orthopedic surgeon, for chronic right ankle/foot pain (Med. Rec. 294-95, 322, 324). Plaintiff never received the requested foot ware (Pl. Dep. 246-47).

---

[11] Depo-medrol can be used via injection as an anti-inflammatory and immunosuppressant in a wide variety of disorders. *Dorland's Illustrated Medical Dictionary* (31st ed. 2007) 499, 1171.

**B. Plaintiff's Achilles Injury and Medical Treatment**

Allegedly due to his improperly healed fracture, Plaintiff began to develop calluses and bunions on his right foot (Med. Rec. 323, 334). Plaintiff claims this developed into a "deformity" where he was not walking "heal-to-toe" (Pl. Dep. 244). On December 13, 2008 – while jogging – Plaintiff ruptured his left Achilles tendon.[12] Plaintiff says his right foot rolled due to it being weak and incompletely healed; he "overcompensated on his left ankle because of the weakness and pain in the right. . .causing the tendon to "shred" (Dkt. No. 1, ¶¶ 64-65).

Plaintiff was admitted to the Emergency Room and underwent a surgical repair of his Achilles tendon the next day (Med. Rec. 321). The surgery was performed Dr. Haverbush. Plaintiff had follow-up visits with Dr. Haverbush on December 30, 2008, January 23, 2009, February 27, 2009, March 27, 2009 and April 10, 2009 (Med. Rec. 14-27).

During a follow-up visit, Plaintiff asked Dr. Haverbush to evaluate his right foot. On March 27, 2009, Dr. Haverbush noted some pain and swelling in Plaintiff's foot over the fifth metatarsal and opined that Plaintiff "would require a screw fixation of the right fifth metatarsal and a bone graft. . .to be placed in the non-union site of the right fifth metatarsal" (Med. Rec. 17). However, Dr. Haverbush viewed this as elective surgery (Dkt. No. 75, Ex. 3 (Haverbush Aff. ¶¶ 13-14)). The request for surgery was denied.

### 1. Dr. Vemulapalli

While still under the care of Dr. Haverbush for follow-up treatment, Dr. Vemulapalli saw Plaintiff on April 14, 2009. During this visit, Plaintiff complained of right foot pain. Dr.

---

[12] The Achilles tendon "connects the calf muscle to the heel bone. It lets you rise up on your toes and push off when you walk or run." *WebMD: Achilles Tendon Problems*, http://www.webmd.com/a-to-z-guides/achilles-tendon-problems-topic-overview.

Vemulapalli advised the Plaintiff to continue Lodine, warm soaks and to use an ACE wrap while awaiting insurance approval for continued orthopedic care (Dkt. No. 75, Ex. A (Vemulapalli Aff. ¶ 3). Dr. Vemulapalli requested authorization for an additional orthopedic consultation, which was approved on April 28, 2009.

Plaintiff claims that he was seen by Dr. Vemulapalli on more than one occasion. For instance, Plaintiff claims he presented to Dr. Vemulapalli on April 9, 2009 – less than two weeks after Dr. Haverbush saw him and noted *some* swelling – at which time he alleges his foot was "2-3 times its normal size. . . [and] black and purple [in color]" (Pl. Dep. 298, 331-332). Plaintiff claims that despite seriousness of his condition, Dr. Vempulapalli "looked at" but did not conduct an examination of his foot (Dkt. No. 92, p. 2; Pl. Dep. 318).

### 2. Dr. Antonini

Plaintiff claims that he received treatment from Dr. Antionini. While Dr. Antonini's name does appear as "provider" on a few of Plaintiff's medical records (Dkt. No. 95, Ex. B), it is clear that the treatment or recommendations listed on those records were provided by other medical personnel. Dr. Antonini testified that he did not provide any care to Plaintiff (Dkt. No. 95, Ex. C (Antonini Dep. 26-29)).

### III.  ANALYSIS

## A. Standard of Review

### 1. Motion to Dismiss

 Fed.R.Civ.P. 12(b)(6) provides for dismissal of a complaint for failure to state a claim upon which relief can be granted. The Supreme Court has made clear that, "to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim for

relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (holding that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."), quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007).  Although the pleader is given the benefit of the doubt as to inferences that can be derived from the allegations, that deference "does not extend to facts which are not 'well-pleaded.' " *Greenberg v. Compuware Corp.*, 889 F.Supp. 1012, 1015–1016 (E.D. Mich. 1995).

Where a plaintiff is proceeding without the assistance of counsel, the court is required to liberally construe the complaint and hold it to a less stringent standard than a similar pleading drafted by an attorney.  *Haines v. Kerner*, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972); *Hahn v. Star Bank*, 190 F.3d 708, 715 (6th Cir. 1999).  However, courts may not rewrite a complaint to include claims that were never presented, *Barnett v. Hargett*, 174 F.3d 1128 (10th Cir. 1999), nor may courts construct the plaintiff's legal arguments for him, *Small v. Endicott*, 998 F.2d 411 (7th Cir. 1993).

### 2.  *Summary Judgment*

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  On a motion for summary judgment, the court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Eward*, 241 F.3d 530, 531 (6th Cir. 2001).

The moving party has the initial burden of demonstrating an absence of evidence to support the non-moving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587. The Court must determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to a jury or whether the evidence is so one-sided that the moving party must prevail as a matter of law. *See Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

**B. The Moving Defendants were not Deliberately Indifferent to Plaintiff's Foot Injury**

A prisoner's claim that his constitutional right to medical treatment was violated is analyzed under the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97 (1976). To state a § 1983 claim for a violation of a prisoner's Eighth Amendment rights due to inadequate medical care, the prisoner must allege facts evidencing a deliberate indifference to serious medical needs. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). To succeed on a claim of deliberate indifference, Plaintiff must satisfy two elements, an objective one and a subjective one. *Wilson*, 501 U.S. at 300. The objective element is satisfied by a showing that Plaintiff had a serious medical need. *Wilson*, 501 U.S. at 297; *Farmer v. Brennan*, 511 U.S. 825 (1994). "To satisfy the subjective component, Plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact

draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001), citing *Farmer*, 511 U.S. at 837.  Emphasizing the subjective nature of this inquiry, the Supreme Court has noted that "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.  Deliberate indifference is characterized by obduracy and wantonness, not inadvertence or good faith error. *Gibson v. Foltz*, 963 F.2d 851, 853 (6th Cir. 1992). Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.  *Estelle*, 429 U.S. at 106.  Nor is Plaintiff entitled to the "best" medical treatment available.  *McMahon v. Beard*, 583 F.2d 172, 174 (5th Cir. 1978); *Irby v. Cole*, No. 4:03cv141-WHB-JCS, 2006 WL 2827551, at *7 (S.D. Miss. Sept. 25, 2006).  Moreover, where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, courts are reluctant to second guess medical judgments. *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976).

### 1. Injuries to the 5th Metatarsal

Although not definitively diagnosed until after Plaintiff underwent his first of several x-rays, Plaintiff suffered a non-displaced fracture of the fifth metatarsal.  An accepted treatment option for non-displaced fractures of the fifth metatarsal is to allow them to heal with immobilization.[13]   Furthermore, according to the Cleveland Clinic, "[e]very fracture carries the

---

[13] *See* Lawrence SJ, Botte MJ., *Jones' Fractures and Related Fractures of the Proximal Fifth Metatarsal*, Foot Ankle. 1993 Jul-Aug; 14(6):358-65. Review. PubMed PMID: 8406253; Gary B. Fetzer, MD and Rick Wright, MD, *Metatarsal Shaft Fractures and Fractures of the Proximal Fifth Metatarsal*, Clinics in Sports Medicine, vol. 25:1 (Jan. 2006), *available at* http://www.mdconsult.com/das/article/body/235636455-3/jorg=journal&source=&sp=15902327 &sid=0/N/506942/1.html?issn=02785919&_returnURL=http%3A//linkinghub.elsevier.com/retri eve/pii/S0278591905000803%3Fshowall%3Dtrue.

risk of failing to heal and resulting in a nonunion.  While nonunions can occur in any bone, they are most common in the tibia, humerus, talus, *and fifth metatarsal bone*." (Emphasis added).[14] *See Hines v. Secretary of Health and Human Services,* 940 F.2d 1518, 1526 (Fed. Cir. 1991) ("[w]ell-known medical facts are the types of matters of which judicial notice may be taken.") (citing *Franklin Life Insurance Co. v. William Chapman & Company,* 350 F.2d 115, 130 (6th Cir. 1965)*, cert. denied,* 384 U.S. 928 (1966)).

### 2. *Medical personnel*

A reasonable jury would not conclude that either Nurse Cary, Dr. Mohan, P.A. Kearney or Dr. Vemulapalli's treatment of Plaintiff  was deliberately indifferent or grossly negligent.  As outlined above, Plaintiff clearly received some medical treatment from these medical personnel and the general principle of disfavoring judicial second guessing of the medical treatment provided applies unless the treatment was "so cursory as to amount to no treatment at all" or was "grossly inadequate." *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843-44 (6th Cir. 2002) (quoting *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989)); *McCarthy v. Place*, 313 Fed.Appx. 810, 814- 815 (6th Cir. 2008) (a question of fact exists as to whether a prison dentist, who for seven months treated an inmate complaining of intense pain due to a cavity with only ibuprofen – instead of filling the cavity – was deliberately indifferent).  Grossly inadequate medical care is that which is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Terrance*, 386 F.3d at 844 (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033).  This Magistrate Judge finds that the treatment provided

---

[14] http://myclevelandclinic.org/disorders/frctures/or_non-union.aspx. *See also* http://mdguidelines.com/malunion-and-nonunion-of-fracture: (noting that fractures of the fifth metatarsal are associated with a high risk of nonunion).

by Nurse Cary, Dr. Mohan, P.A. Kearney and Dr. Vemulapalli was well beyond cursory and, at best, states only a claim for medical malpractice – which is not actionable under the Eighth Amendment.

The difficulty of maintaining a deliberate indifference claim where medical personnel provide more than cursory care is best illustrated by the recent case of *Jones v. Muskegon County*, 625 F.3d 935 (6th Cir. 2010).  In *Jones*, Plaintiff, the father of deceased inmate Vernard Jones ("Jones"), sued a prison doctors, nurses and corrections officers at the Muskegon County Jail after Jones died of complications from stomach cancer.

Jones was seen by Dr. Deitrick at the prison.  At the time, he weighed just 124 pounds – having lost almost 50 pounds in six months.  Dr. Deitrick diagnosed Jones with obstipation (intractable constipation) and treated him with a laxative.  When Dr. Deitrick evaluated Jones a few days later, Jones had lost an additional seven pounds and complained of sharp abdominal pain.  Dr. Deitrick scheduled a CT scan, liver and kidney profile – but did not send Jones to the hospital.

Over the next few days, Jones continued to complain of stomach pain.  However, it was not until his situation became dire that he was transferred to a hospital.  Doctors at the hospital described Jones as "emaciated" and "clinically dehydrated."  A large cancerous tumor was found.  But, it was too late.  Jones was placed on hospice care and later died in his cell.

The district court granted the defendants motions for summary judgment.  Plaintiff appealed.  As to Dr. Deitrick, the Sixth Circuit upheld the dismissal finding that:

> Dr. Deitrick's initial diagnosis and treatment of Jones with a laxative seems inappropriate in light of Jones's substantial weight loss and sharp stomach pain. . .Even though Dr.

-16-

Deitrick's initial diagnosis was incorrect, "[n]egligence in diagnosing a medical condition does not constitute unconstitutional deliberate indifference." (Citation omitted). Furthermore, the record shows that, after his initial visit with jones, Dr. Deitrick scheduled various exams to determine more precisely what was affecting Jones and transferred him to the hospital when it was apparent that his condition was worsening. A reasonable jury would not conclude that Dr. Deitrick's conduct in this regard amounted to "grossly inadequate care." (Citation omitted).

*Id*. at 945-46. A review of the treatment provided by Nurse Cary, Dr. Mohan, P.A. Kearney and Dr. Vemulapalli leads to the same conclusion – a reasonable jury would not find that their treatment amounted to grossly inadequate care.

Drs. Antonini and Onuigbo did not physically examine Plaintiff. Dr. Antonini had no involvement whatsoever in Plaintiff's care; Dr. Onuigbo made two routine reviews of Plaintiff's medical file, noted Plaintiff's treatment by an orthopedic specialist, renewed his accommodation for a ground floor cell, ordered ACE bandages and ordered a follow-up visit with the MSP. Under these circumstances, no reasonable juror would find either doctor was deliberately indifferent to Plaintiffs medical needs.

Plaintiff was understandably frustrated by the slow pace of his recovery. But, as discussed above, this particular type of fracture tends to be associated with a high risk of nonunion. Plaintif's care may not have been ideal but he was appropriately treated: his injury was immobilized; he was provided multiple x-rays and frequently evaluated by medical personnel. He was given cell and temporary work accommodations, a fracture boot, ACE bandages, pain and anti-inflammatory medication and seen by a specialist. When viewed in the context of the

individual medical treatment decisions or as a course of treatment, Plaintiff's serious foot injury was not treated with deliberate indifference as a matter of law.

### 3. *Ludwig and Anderson*

Ludwig and Anderson have presented evidence that they were not present in the kitchen as plaintiff alleges. But, assuming they were present, Plaintiff has presented no evidence that either Ludwig or Anderson subjectively perceived facts from which to infer substantial risk to Plaintiff, in fact drew the inference, and then disregarded that risk." *Comstock*, 273 F.3d at 703.

Moreover, there is no evidence that either person was even aware of the severity of Plaintiff's injury, beyond the fact that Plaintiff may have been limping. Neither Ludwig or Anderson are medically trained and – at the time – Plaintiff had not been diagnosed with a broken toe. As such, Plaintiff's injury was not "objectively serious." In *Blackmore v. Kalamazoo County*, 390 F.3d 890 (6th Cir. 2004), the Sixth Circuit articulated the standard for an "objectively serious" medical need as follows:

> Most other circuits hold that a medical need is objectively serious if it is "one that has been diagnosed by a physician as mandating treatment *or* one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." As the Eleventh Circuit observed, "[c]ases stating a constitutional claim for immediate or emergency medical attention have concerned medical needs that are obvious even to a layperson because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem [whereas] delay or even denial of medical treatment for superficial, nonserious physical conditions does not constitute a [constitutional] violation."

*Id.* at 896-897 (citations omitted). Therefore, Plaintiff's Claims against Ludwig and Anderson must be dismissed.

### 3. *CMS and PHS*

Under *Monell*, in order to establish a § 1983 claim against a corporation, a plaintiff must allege that he suffered deliberate indifference due to a corporate policy, practice, or custom. *See Monell*, 436 U.S. at 690; *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 818 (6th Cir. 1996) (extending the holding in Monell to private corporations).  A claim relying on the doctrine of respondeat superior will not lie. *See Monell*, 436 U.S. at 691.  In order to satisfy the requirements set forth in *Monell*, a plaintiff must "identify the policy, connect the policy to the [corporation] itself and show that the particular injury was incurred because of the execution of that policy." *Coogan v. City of Wixom*, 820 F.2d 170, 176 (6th Cir. 1987).

Plaintiff has failed to demonstrate a claim against either CMS or PHS as a matter of law. Instead, Plaintiff's claims involve the specific medical treatment decisions of various health care providers  – and are not connected to any policy, custom or practice of CMS or PHS.  Even if Plaintiff could establish that his these specific providers ignored or mistreated his injury, a jury could not reasonably infer that this meant CMS or PHS had a "widespread, permanent, and well-settled custom" of ignoring inmate medical requests. *Jones*, 625 F.3d at 946-47.  Therefore, Plaintiff's claims against CMS and PHS must be dismissed.

## C. Gross Negligence

The standard for deliberate indifference and the standard for gross negligence are different. Gross negligence is a less stringent standard.  *Jones*, 625 F.3d at 947.  However, under Michigan law, gross negligence still requires "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results."  M.C.L. § 691.1407(2)(c).  For the reasons stated above, no

reasonable jury would find that the moving Defendants treatment of Plaintiff meets even the less stringent standard of gross negligence.

**D.  The Unserved Defendant Should be Dismissed**

Finally, Defendant Harris should be dismissed without prejudice. "An inmate who brings a civil rights complaint must specifically identify each defendant against whom relief is sought and must give each defendant notice of the action by serving upon him a summons and copy of the complaint." *Reed-Bey v. Pramstaller*, No. 06-10934, 2007 WL 2421422, *2 (E.D. Mich. Aug.23, 2007), citing *Feliciano v. DuBois*, 846 F.Supp. 1033, 1048 (D. Mass. 1994). Under Fed.R.Civ.P. 4(m), defendants must be served within 120 days of filing the complaint.  Harris has not been served and this case has been pending for more than a year and-a-half; thus, it is recommended that Harris be dismissed without prejudice. *Mackall v. Doe*, No. 05-60083-AA, 2005 WL 1843449, *1 (E.D. Mich. July 29, 2005), citing *Awdish v. Pappas*, 159 F.Supp.2d 672, 673, n. 1 (E.D. Mich. 2001), and *Johnson v. City of Ecorse*, 137 F.Supp.2d 886, 892 (E.D. Mich. 2001). This Report and Recommendation will serve as notice to Plaintiff under Rule 4(m).

## IV.  CONCLUSION

For the reasons indicated above, **IT IS RECOMMENDED** that: (1) Sasikala Vemulapalli, M.D.'s ("Dr. Vemuapalli") motion for summary judgment and/or motion to dismiss (Dkt. No. 75) be **GRANTED**; (2) Audberto Antonini M.D.'s ("Dr. Antonini") motion to dismiss and/or for summary judgment (Dkt. No. 76) be **GRANTED**; (3) John Kearney, P.A.'s ("P.A. Kearney") motion to dismiss and/or for summary judgment (Dkt. No. 79) be **GRANTED**; (4) Krishn Mohan, M.D. ("Dr. Mohan"), Maureen Onuigbo, M.D. ("Dr. Onuigbo") and Correctional Medical Services, Inc.'s ("CMS") motion to dismiss and/or for summary judgment (Dkt. No. 86) be

**GRANTED**; (5) Prison Health Services, Inc. ("PHS") and P.A. Kearney's motion for summary judgment (Dkt. No. 97) be **GRANTED**; and Robert Anderson ("Anderson"), Deborah Cary ("Nurse Cary") and Jerry Ludwig's ("Ludwig") partial motion to dismiss and/or for summary judgment (Dkt. No. 109) be **GRANTED**.  Plaintiff's claims against these defendants should be **DISMISSED WITH PREJUDICE.  IT IS FURTHER RECOMMENDED** that Plaintiff's claims against Harris be **DISMISSED WITHOUT PREJUDICE** for lack of service.

    The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

    Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be no more than 20 pages in length unless,

by motion and order, the page limit is extended by the court.  The response shall address  each

issue contained within the objections specifically and in the same order raised.

s/Mark A. Randon

Mark A. Randon

United States Magistrate Judge

Dated:  January 27, 2012

*Certificate of Service*

*I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, January 27, 2012, by electronic and/or ordinary mail.*

*s/Melody R. Miles*

*Case Manager to Magistrate Judge Mark A. Randon*

*(313) 234-5542*
